IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| In re MedStar ERISA Litigation | * | Civil Action No. RDB-20-1984 |
|  | * |  |
|  | * |  |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiffs in this consolidated class action allege breach of fiduciary duty under the Employee Retirement Income Security Act of 1974, as amended 29 U.S.C. § 1001, *et seq.* ("ERISA"), failure to monitor, and, in the alternative, knowing breach of trust, for the alleged imprudent management of the MedStar Health, Inc. Retirement Savings Plan. (*See* ECF No. 11.) On November 6, 2020, the Defendants MedStar Health, Inc. ("MedStar"), the MedStar Health, Inc. Retirement Savings Plan Committee ("Administrative Committee"), the Board of Directors of MedStar Health, Inc. ("MedStar Board"), and the unnamed members of the Committee and Board ("Does. 1-20") (collectively "Defendants") filed a Motion to Dismiss the Plaintiffs' Amended Complaint (ECF No. 29), arguing that the Plaintiffs have failed to state a claim for relief. The submissions have been reviewed, and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2018). For the reasons that follow, the Defendants' Motion to Dismiss (ECF No. 29) is DENIED.

### BACKGROUND

**A. The Plan and Plaintiffs' Claims**

In ruling on a motion to dismiss, this Court "accept[s] as true all well-pleaded facts in a complaint and construe[s] them in the light most favorable to the plaintiff." *Wikimedia Found.*

1

*v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (citing *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015)).  The Plaintiffs in this consolidated class action are participants in the MedStar Health, Inc. Retirement Savings Plan (the "Plan"), a qualified tax-deferred, defined contribution retirement plan.  (ECF No. 11 ¶¶ 1-2.)  As of December 31, 2018, the Plan had 25,010 participants with account balances and assets totaling nearly $1.8 billion, placing it in the top 0.1% of all defined contribution plans by plan size.  (*Id.* ¶ 4.)  MedStar, a Maryland non-profit corporation, is the Plan's sponsor.  (*Id.* ¶¶ 5, 10, 11.)  Plaintiffs assert that MedStar's Administrative Committee is the Plan's administrator.  (*Id.* ¶ 13.)  Plaintiffs further assert that MedStar's Board has the ability to appoint and monitor the members of the Committee.  (*Id.* ¶ 12.)  Accordingly, the Plaintiffs allege that MedStar, its Board, the members of the Board, the Administrative Committee, and the members of the Committee are all fiduciaries under Sections 1002 and 1102 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*  (*Id.* ¶¶ 12-13.)  Unable to identify the current members of the MedStar Board nor the Administrative Committee, Plaintiffs named Does 1-20 as placeholders.  (*Id.* ¶ 12-14.)  Plaintiffs contend that pursuant to Rule 15 of the Federal Rules of Civil Procedure, they will seek to amend their Amended Complaint to name the members of the Committee and other responsible individuals as defendants as soon as their identities are discovered.  (*Id.* ¶ 14.)

The Plan is a single-employer 403(b) plan in which participants direct the investment of their contributions into various investment options offered by the Plan.  (*Id.* ¶ 19.)  Each participant's account is credited with the participant contributions, and earnings or losses thereon.  (*Id.*)  The Plan pays Plan expenses from its assets, and the majority of administrative

2

expenses are paid by participants as a reduction of investment income. (*Id.*) Each participant's account is charged with the amount of distribution taken and an allocation of administrative expenses. (*Id.*) The available investment options for participants of the Plan include various mutual funds, guaranteed investment contracts, and a self-directed brokerage account. (*Id.*) Among other investments, the Plan lineup offers a suite of thirteen target date funds. (*Id.* ¶ 24.) A target date fund is an investment vehicle that offers an all-in-one retirement solution through a portfolio of underlying funds that gradually shifts to become more conservative as the assumed target retirement year approaches. (*Id.*) Managers make changes to the allocation to stocks, bonds, and cash over time, and these shifts are referred to as a fund's "glide path." (*Id.*) The underlying mutual funds that target date fund managers choose to represent each asset class can be "actively" or "passively" managed. (*Id.*) Funds are "actively" managed when the investment manager is responsible for deciding which securities should be bought and sold and in which quantities. (*Id.* ¶¶ 26, 30.) On the other hand, "passively" managed funds simply track an establish market index. (*Id.*)

In their Amended Complaint, the Plaintiffs in part argue that the Defendants failed to monitor the average expense ratios charged to similar sized plans. (*Id.* ¶ 50.) They allege that participants in the Plan were offered an "exceedingly expensive menu of investment options, clearly demonstrating that Defendants neglected to benchmark the costs of the Plan lineup or consider ways in which to lessen the fee burden on participants during the pertinent period." (*Id.*) From 2014 through 2018, the Plaintiffs allege that the Plan paid out investment management fees of 0.45%-0.47% of its total assets, considerably more than those of comparable plans. (*Id.*)

The Plaintiffs' Amended Complaint also challenges the inclusion of three specific funds in that menu:

### i. The Fidelity Freedom Fund (the "Active suite")

Since December 31, 2009, the Plan has offered the Fidelity Freedom fund target date suite which invests predominantly in actively managed Fidelity mutual funds. (*Id.* ¶¶ 25-26.) It is referred to by the Plaintiffs as the "Active suite." (*Id.* ¶ 25.) Not only is the Active suite an option for all participants, but it is also designated as the Plan's Qualified Default Investment Alternative ("QDIA"), meaning if participants do not direct where their assets should be invested, all contributions are automatically invested into the Active suite. (*Id.* ¶ 27.) The Plaintiffs assert that the Defendants failed to compare the Active suite to Fidelity's allegedly less costly and less risky Freedom Index fund, a passively managed fund which places no assets under active management, electing instead to invest in Fidelity funds that simply track market indices. (*Id.* ¶¶ 25-26.) Plaintiffs assert that this passively managed fund, referred to by Plaintiffs as the "Index suite," shares a management team with the Active suite and has a "nearly identical glide path" but is "a far superior option, and consequently the more appropriate choice for the Plan." (*Id.* ¶¶ 25-26, 29.) Overall, the Plaintiffs allege that between the Active suite's high-risk strategy and considerable cost, noticeable outflow of funds, lack of five-star ratings, and inferior performance as compared to the Index suite, the Defendants' decision to maintain the Active suite as a part of the Plan was imprudent.

With respect to the high-risk nature of the funds, the Plaintiffs claim that the Active suite subjects its assets to significantly more risk than the Index suite. (*Id.* ¶ 29.) Although active funds like the Active suite "may experience success over shorter periods," they are

"rarely able to time the market efficiently and frequently enough to outperform the market." (*Id.* ¶ 30.) The Plaintiffs argue that this makes the Active suite unsuitable for Plan participants. (*Id.* ¶ 29.) They further allege that the Active suite series underwent a strategy overhaul in 2013 and 2014 which involved granting its managers greater discretion to deviate from the glide path allocations by ten percentage points in either direction. (*Id.* ¶ 33.) Fidelity allegedly encouraged its managers to attempt to time market shifts in order to locate underpriced securities, creating further risk for investors like Plan participants invested in the Active suite. (*Id.*)

The strategy change was met with criticism. A March 2018 Reuters special report on the Fidelity Freedom funds (the "Reuters Report") details how many investors lost confidence in the Active suite "because of their history of underperformance, frequent strategy changes and rising risk." (*Id.* ¶ 33 (citing *Special Report: Fidelity puts 6 million savers on risky path to retirement*, available at https://www.reuters.com/article/us-fundsfidelity-retirement-special-rep/ special-report-fidelity-puts-6-million-savers-on-risky-path-to-retirementidUSKBN1GH1SI.) The Reuters Report quotes a member of Longfellow Advisors, who told Reuters that, after the 2014 changes, "it was not clear to us that [the managers of the Active suite] knew what they were doing." (*Id.*) The Plaintiffs concede that many target date fund managers are increasing exposure to riskier investments in an effort to augment performance by taking on additional risk, but as the president of the research firm Target Date Solutions reportedly stated, the Active suite had gone further down this path than its peers. (*Id.*) Additionally, while in recent years the Index suite has received several five-star ratings by Morningstar, the Active suite has failed to earn any five-star ratings. (*Id.* ¶ 39.)

5

The Plaintiffs further argue that the Active suite's volatility has been magnified by the current COVID-19 crisis and that Plan participants close to their retirement age do not have ample time to recoup significant losses before they start withdrawing their retirement savings. (*Id.* ¶ 34.) In contrast, the Plaintiffs assert that the Index suite has handled the current volatility well. (*Id.*)

With respect to the cost of the Active suite, the Plaintiffs assert that the fees charged by the Active suite are many multiples higher than the Index suite's industry-leading low costs, and that even a minor increase in a fund's expense ratio (the total annual cost to an investor, expressed as a percentage of assets) can considerably reduce long-term retirement savings. (*Id.* ¶ 35.) Plaintiffs assert that considering the gap in expense ratios from the Plan's current investment in the Active suite to the Institutional Premium share class of the Index suite, the Plan could have saved approximately $5.10 million in costs in 2018 alone. (*Id.* ¶ 37.) Plaintiffs also note that Fidelity derives profits from the collection of management fees, incentivizing the company to specifically promote its investment products which charge the highest fees to each plan for which it record-keeps. (*Id.*)

As for the outflow of funds, Plaintiffs state that according to Morningstar's report on the 2019 Target Date Fund Landscape, investor demand for low-cost target date options has "skyrocketed" in recent years. (*Id.* ¶ 38.) Yet, Plaintiffs allege that in recent years investor confidence in the Active suite has deteriorated: in 2018, the suite saw an estimated $5.4 billion in net outflows. (*Id.*) They further allege that movement of funds out of the Active suite has been substantial for years: the Reuters Report noted that nearly $16 billion was withdrawn from the Active suite "fund family" over the four years prior to 2018 as well. (*Id.*) Meanwhile,

Plaintiffs assert that the Index suite has experienced significant inflows, receiving an estimated $4.9 billion in new funds in 2018 alone. (*Id.*)

Finally, looking at the performance of the Active suite since the strategy overhaul in 2014, the Plaintiffs allege that the Active suite has simply failed to measure up to the returns produced by the comparable Index suite. (*Id.* ¶ 40.) Plaintiffs allege that since the strategic changes took effect in 2014, the Index suite has outperformed the Active suite in four out of six calendar years. (*Id.*) They further allege that broadening the view to historical measures that encompass a period closer to a full market cycle, the Active suite has substantially underperformed the Index suite on a trailing three- and five-year basis. (*Id.*)

### ii. The John Hancock Disciplined Value Fund

The second fund challenged by the Plaintiffs is the John Hancock Disciplined Value Fund Class R6 ("John Hancock Fund"), which they assert has significantly underperformed both its benchmark (identified by the fund's manager as the Russell 1000 Value Index) and its peer group (as defined by Morningstar). (*Id.* ¶ 43.) Plaintiffs allege that the deficiency of this fund is evident given a review of annual returns compared against the benchmark and peer group as well as its rolling five-year performance. (*Id.*) Plaintiffs argue that when an investment option's track record is so apparently poor, Defendants should necessarily replace the fund in the Plan with an alternative that has demonstrated the ability to consistently outperform the benchmark. (*Id.* ¶ 46.)

### iii. The Baron Small Cap Fund

The third challenged fund is the Baron Small Cap Fund Institutional Class ("Baron Fund"), which was replaced by the managers of the Plan in 2018. (*Id.* ¶ 47.) The Plaintiffs

assert that the fund had been consistently and substantially underperforming its manager-identified benchmark, the Russell 2000 Growth Index, as well as its peer group, for many consecutive years and, accordingly, should have been jettisoned from the Plan's investment options earlier. (*Id.*) In 2016, the fund trailed the benchmark by 197 basis points (1.97%) on a rolling 5-year basis and by 99 basis points (0.99%) on a rolling ten-year basis. (*Id.* ¶ 46.) Again, the Plaintiffs assert that when a fund's track record is this poor, it should be replaced. (*Id.*)

### B. Procedural Background

On July 6, 2020, the Plaintiff Elsa Reed brought this lawsuit on behalf of herself and the proposed class of all participants and beneficiaries of the Plan at any time on or after July 6, 2014 to the present. (*See* No. RDB-20-1984, ECF No. 1 ¶ 55.) On August 4, 2020, Plaintiff Xania E. Watson also brought suit against Defendants, seeking relief for herself and the class of participants and beneficiaries in the Plan at any time between August 4, 2014 through the date of judgment. (*See* No. RDB-20-2250, ECF No. 1 ¶ 44.) On September 18, 2020, this Court consolidated the two actions under *Reed*, RDB-20-1984, and renamed the consolidated class action *In re MedStar ERISA Litigation*. (ECF No. 10.)

On September 22, 2020, the Plaintiffs filed an Amended Complaint (ECF No. 11). In Count I of the Amended Complaint, the Plaintiffs assert a claim for breach of fiduciary duties under ERISA § 404(a)(1)(A), (B), and (D), 29 U.S.C. § 1104(a)(1)(A), (B), and (D), asserting that the Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries by failing to remove imprudent fund options and by continuously offering a highly priced menu of investment

options. (ECF No. 11 ¶¶ 73-77.)  Count II asserts a claim for failure to monitor fiduciaries and co-fiduciary breaches, alleging that MedStar and the Administrative Committee breached their fiduciary monitoring duties by failing to monitor and evaluate the work of appointees on the Committee and by failing to remove those whose performances were inadequate. (*Id.* ¶¶ 78-86.)  In Count III the Amended Complaint asserts, in the alternative, that to the extent any of the Defendants are not deemed a fiduciary or co-fiduciary under ERISA, each such Defendant should be liable for knowing participation in breaches of trust. (*Id.* ¶¶ 87-89.)  On November 6, 2020, the Defendants filed a Motion to Dismiss for Failure to a State Claim, asking this Court to dismiss all three counts of the Amended Complaint. (ECF No. 29.)

## STANDARD OF REVIEW

The Defendants move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), under which the Plaintiffs' pleading is subject to dismissal if it "fails to state a claim upon which relief can be granted." Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P 8(a)(2).  The purpose of Rule 12(b)(6) is "to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (quoting *Bell Atl., Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Under the plausibility standard, a complaint must contain "more than labels and conclusions" or a "formulaic

recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). A complaint need not include "detailed factual allegations." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). A complaint must, however, set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotations omitted).

## ANALYSIS

### I. Breach of Fiduciary Duty (Count I)

Under ERISA, a fiduciary of an employee benefit plan must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries[,] and[] for the exclusive purpose of[] providing benefits to participants and their beneficiaries[] and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A)(i)-(ii). A fiduciary is also required to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims" and "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with" ERISA. 29 U.S.C. § 1104(a)(1)(B), (D).

Section 409(a) of ERISA imposes liability for breach of fiduciary duty:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

10

29 U.S.C. § 1109(a). Accordingly, to establish that Defendants are liable for breach of fiduciary duty, the Plaintiffs must show that: (1) the Plan is governed by ERISA; (2) the Defendants were fiduciaries of the Plan; and (3) the Defendants breached their duties of prudence and/or loyalty under ERISA, resulting in losses to the participants of the Plan. At this stage, the Defendants do not contest that the Plan is governed by ERISA, nor that the Defendants are fiduciaries of the Plan. (*See* ECF No. 29-1.) They instead challenge the sufficiency of the Amended Complaint arguing that the Plaintiffs have failed to plead any facts that could support a reasonable inference that the Defendants breached their fiduciary duty of prudence. (*Id.*)

Under the prudent man standard, fiduciaries must exercise prudence in administering a retirement plan. *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 (4th Cir. 2007). This includes exercising prudence "in selecting and retaining available investment options." *Id.* "A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015). When deciding whether plan fiduciaries have acted prudently in the context of a fiduciary's failure to engage in a transaction, such as removal or closure of a fund, a court considers whether the fiduciaries have "'fail[ed] to investigate and evaluate the merits of [their] investment decisions.'" *DiFelice*, 497 F.3d at 420 (quoting *Kuper v. Iovenko*, 66 F.3d 1447, 1459 (6th Cir. 1995)). This evaluation "must 'depend[] on the character and aim of the particular plan and decision at issue and the circumstances prevailing at the time.'" *Id.* (quoting *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 299 (5th Cir. 2000)). A fiduciary's actions cannot be

measured in hindsight. *Id.* at 424 (citing *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 917-18 (8th Cir. 1994)).

The Plaintiffs' primary claim in this case is that the Defendants breached their duty of imprudence in continuing to offer the Active suite, the John Hancock Fund, and the Baron Fund as investment options in the Plan, despite their deficiencies. With respect to the John Hancock and Baron Funds, the Plaintiffs provide data comparing each fund to the benchmarks selected by the funds' managers, as well as their peer groups as identified by Morningstar. (ECF No. 11 ¶¶ 42-49.) The data suggests that each fund was underperforming their benchmarks and peer groups on both annualized bases, as well as on rolling five- and ten-year bases. (*Id.*)

With respect to the Active suite, the Plaintiffs allege several reasons why the Defendants' retention of the fund was imprudent. As detailed above, the Plaintiffs assert that the Active suite is riskier and more expensive than the Index suite, with which it shares the same investment management company, investment managers, and equity glide path. (*Id.* ¶¶ 29-31.) They also assert that since the fund's overhaul in 2013 and 2014, the Active suite and most of its components have consistently underperformed the Index suite. (*Id.* ¶¶ 40-41.) The Amended Complaint further alleges that this overhaul and subsequent underperformance did not go unnoticed to the investing public, citing articles criticizing the fund's performance and a net outflow of $16 billion from 2014 to 2018. (*Id.* ¶ 38.) They also assert that this underperformance was reflected in the fund's lack of five-star ratings during the class period. (*Id.* ¶ 39.)

In their Motion to Dismiss, the Defendants' primarily argue that the Plaintiffs have failed to state a plausible claim for relief because they cannot use the passively-managed Index suite as a benchmark for the actively-managed Active suite. (ECF No. 29-1 at 10.) Courts have held that where a plaintiff claims that a prudent fiduciary in like circumstances would have selected a different fund based on the cost or performance of the selected fund, the plaintiff must provide a "sound basis for comparison—a meaningful benchmark." *See Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018). It is also true that in *Davis v. Salesforce.com, Inc.* the court dismissed the plaintiffs' claim for breach of fiduciary duties under ERISA where the plaintiffs' allegations that passively managed funds were available as alternatives to the actively managed funds offered in the challenged plan did not suffice to demonstrate imprudence. No. 20-cv-01753-MMC, 2020 WL 5893405, at *3 (N.D. Cal. Oct. 5, 2020). The court explained "passively managed funds are not comparable to actively-managed funds in any meaningful way." *Id.* (internal quotations and citations omitted). Accordingly, the court held, "[p]assively managed funds . . . ordinarily cannot serve as meaningful benchmarks for actively managed funds, because the two types of funds 'have different aims, different risks, and different potential rewards that cater to different investors.'" *Id.* (quoting *Davis v. Wash. Univ.*, 960 F.3d 478, 485 (8th Cir. 2020)).

Nonetheless, the Defendants' arguments with respect to the selection of the Index suite as the Active suite's benchmark do not compel dismissal of the Plaintiffs' Complaint. Courts have specifically held that the determination of the appropriate benchmark for a fund is not a question properly resolved at the motion to dismiss stage. In *Cunningham v. Cornell Univ.*, the court held that the plaintiffs' allegations that specific funds underperformed over one-, five-,

13

and ten-year periods and that lower-cost, higher performing investments were available plausibly stated a claim for relief.  No. 16-cv-6525 (PKC), 2017 WL 4358769, at *7 (S.D.N.Y. Sept. 29, 2017).  In doing so, the court stated that the defendants' arguments that the plaintiffs used "inappropriate benchmarks to assess the performance of the challenged options" raised "factual questions that [were] not properly addressed on a motion to dismiss."  *Id.* (citing *Sacerdote v. New York Univ.*, No. 16-cv-6284 (KBF), 2017 WL 3701482, at *10 (S.D.N.Y. Aug. 25, 2017)).

Moreover, even if this were the proper stage to consider the use of the Index suite as a benchmark, this case is distinguishable from the California court's opinion in *Davis* as the Plaintiffs' have based their claim for imprudence on numerous other grounds.  With respect to the Active suite, the Plaintiffs have not only alleged that the Active suite underperformed in comparison to the Index suite, but also that the Active suite saw an outflow of investment as well as received criticism from different financial news and reporting services.  Additionally, the Defendants do not challenge the manager-selected identified as the benchmarks for the other allegedly underperforming John Hancock and Baron Funds.  Finally, in addition to claiming imprudence based on the retention of the Active suite, John Hancock, and Baron Funds, the Plaintiffs also assert that the Defendants failed to prudently monitor the Plan's expenses as a whole, alleging the aggregate amount of investment management fees paid by the Plan between 2014 and 2018 was 0.46-0.48% of its total assets, far in excess of the average total plan cost of 0.28% for comparable plans.  (ECF No. 11 ¶¶ 50-51.)    Given these numerous factual allegations, the Plaintiffs have plausibly stated a claim to relief under Count I of their Amended Complaint.

## II. Failure to Monitor (Count II)

In Count II of their Amended Complaint, the Plaintiffs assert that Defendant MedStar is responsible for appointing, overseeing, and removing members of the Administrative Committee, who, in turn, are responsible for appointing, overseeing, and removing members of the Committee. (ECF No. 11 ¶ 79.) The Amended Complaint continues, stating that "[i]n light of its appointment and supervisory authority, MedStar had a fiduciary responsibility to monitor the performance of the Committee and its members" and both MedStar and the Administrative Committee "had a fiduciary responsibility to monitor the performance of the members of the Committee." (*Id.* ¶ 80.)

As the United States Court of Appeals for the Fourth Circuit explained in *Coyne & Delany Co. v. Selman*, plan sponsors, such as MedStar, are generally free under ERISA to amend plans without triggering fiduciary status. 98 F.3d 1457, 1465 (4th Cir. 1996) (citing *Lockheed Corp. v. Spink*, 517 U.S. 882, 890 (1996)). "However, the power (through plan amendment) to appoint, retain and remove plan fiduciaries constitutes 'discretionary authority' over the management or administration of a plan within the meaning of [ERISA, 29 U.S.C.] § 1002(21)(A)," and such authority "carries with it a duty 'to monitor appropriately' those subject to removal." *Id.* (internal citations omitted). A claim for a failure to monitor is derivative of a claim for breach of fiduciary duties of prudence and/or loyalty. *See In re Constellation Energy Grp., Inc.*, 738 F. Supp. 2d 602, 614 (D. Md. 2010). As the Plaintiffs' allegations discussed above are sufficient to make a plausible claim that Defendants breached their fiduciary duties, such allegations also implicate their duty to monitor. The Plaintiffs'

15

substantive allegations concerning the Defendants' relationships to one another and the Plan are sufficient to support Plaintiffs' monitoring claims.

### III. Knowing Breach of Trust (Count III)

In Count III of their Amended Complaint, the Plaintiffs assert in the alternative to their claims for breach of fiduciary duty and failure to monitor that to the extent any of the Defendants are not found to be fiduciaries or co-fiduciaries under ERISA, each such Defendant should be liable for the conduct at issue in this case. The Plaintiffs contend that all Defendants allegedly possessed the requisite knowledge and information to avoid fiduciary breaches at issue here and allegedly knowingly participated in breaches of fiduciary duty by permitting the Plan to offer a menu of poor and expensive investment options. (ECF No. 11 ¶¶ 88-89.) The Defendants' claim that this Count should be dismissed because the Fourth Circuit has "never formally recognized such a cause of action." *Gordon v. CIGNA Corp.*, 890 F.3d 463, 476 (4th Cir. 2018). However, in *Gordon*, the Fourth Circuit proceeded to analyze the knowing breach of trust claim (and found its elements were not satisfied), specifically declining to determine whether the claim presented a cognizable cause of action. *Id.* at 476-77. There are cases which suggest that Fourth Circuit precedent might favor recognition of this claim. *See Pension Ben. Guar. Corp. v. Ross*, 733 F. Supp. 1005, 1008 (M.D.N.C. 1990) (analyzing *Powell v. Chesapeake & Potomac Tele. Co. of Va.*, 780 F.2d 419 (4th Cir. 1985) and *King v. Richardson*, 136 F.2d 849 (4th Cir. 1943)). Given the allegations with respect to the roles and relationships of the Defendants identified in the Complaint, dismissing their claim under Count III at this time would be premature. The Plaintiffs have stated a plausible claim for relief.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion to Dismiss (ECF No. 29) is DENIED.

A Separate Order follows.

Dated: February 4, 2021

                _____/s/_____
                Richard D. Bennett
                United States District Judge