## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ELSA REED, *individually as representative
of a class of similarly situated persons and
on behalf of the Medstar Health, Inc.
Retirement Savings Plan,*

  Plaintiff,

v.

MEDSTAR HEALTH, INC., *et al.*,

  Defendants.

*         *
\*

\*

\*

\*

\*

\*

\*

**CIVIL NO. JKB-20-1984
MEMBER CASE NO. JKB-20-2250**

## MEMORANDUM

Plaintiff Elsa Reed, individually and on behalf of the MedStar Health, Inc. Retirement

Savings Plan ("Plan") and a certified Class of participants and beneficiaries in the Plan, brings this

consolidated class action against Defendants MedStar Health, Inc. ("MedStar"), the MedStar

Health, Inc. Retirement Savings Plan Committee ("Administrative Committee"), the Board of

Directors of MedStar Health, Inc. ("Board"), and the unnamed members of the Administrative

Committee and Board ("Does 1–20") (collectively, "Defendants"). (*See generally* Am. Compl.,

ECF No 11.)  Plaintiff alleges breach of fiduciary duty under the Employee Retirement Income

Security Act of 1974, as amended 29 U.S.C. § 1001, *et seq.* ("ERISA"), failure to monitor

fiduciaries and co-fiduciary breaches, and in the alternative, liability for knowing breach of trust

for the alleged imprudent management of the Plan. (*See generally id.*)

Presently pending before the Court are: (1) Defendants' Motion to Strike Plaintiff's Jury

Demand ("Motion to Strike") (Mot. Strike, ECF No. 87); (2) Defendants' Motion to Exclude the

Opinions and Testimony of Dr. Gerald Buetow Concerning His Fund Replacement Methodology ("Motion to Exclude Buetow") (Mot. Excl. Buetow, ECF No. 88); (3) Defendants' Motion to Exclude the Opinions and Testimony of Michael Geist ("Motion to Exclude Geist") (Mot. Excl. Geist, ECF No. 89); and (4) Plaintiff's Motion for Leave to File a Second Amended Complaint ("Motion to Amend") (Mot. Amend., ECF No. 92).

All Motions are fully briefed, and no hearing is required. *See* Local Rule 105.6 (D. Md. 2023). For the reasons set forth in this Memorandum, a separate Order shall issue granting Defendants' Motion to Strike (ECF No. 87), denying Defendants' Motion to Exclude Buetow (ECF No. 88), granting in part and denying in part Defendants' Motion to Exclude Geist (ECF No. 89), and granting Plaintiff's Motion to Amend (ECF No. 92).

## I.    *Factual Background*[1]

Plaintiff Reed is a former employee of MedStar and a participant in the Plan, a qualified tax-deferred, defined contribution retirement plan. (Am. Compl. ¶¶ 1, 2, 9.) As of December 31, 2018, the Plan had 25,010 participants with account balances and assets totaling nearly $1.8 billion, placing it in the top 0.1% of all defined contribution plans by plan size. (*Id.* ¶ 4.) MedStar, a Maryland non-profit corporation, is the Plan's sponsor. (*Id.* ¶¶ 5, 10, 11.) Plaintiff asserts that Defendants "maintain the Plan, and are responsible for selecting, monitoring, and retaining the service provider(s) that provide investment, recordkeeping, and other administrative services." (*Id.* ¶ 5.) According to Plaintiff, the Board appointed "authorized representatives" of MedStar, including the Administrative Committee, as plan fiduciaries. (*Id.* ¶ 12.) Plaintiff alleges that MedStar, the Board, the members of the Board, the Administrative Committee, and the members

---

[1] Given that there were no motions for summary judgment filed in this case, the Court derives the factual background from the allegations in the Amended Complaint (ECF No. 11).

of the Administrative Committee are all fiduciaries under Sections 1002 and 1102 of ERISA. (Am. Compl. ¶¶ 12, 13.)

### A. The Plan

The Plan is a single-employer 403(b) plan in which participants direct the investment of their contributions into various investment options offered by the Plan. (Am. Compl. ¶ 19.) Each participant's account is credited with the participant contributions, and earnings or losses thereon. (*Id.*) The Plan pays Plan expenses from its assets, and the majority of administrative expenses are paid by participants as a reduction of investment income. (*Id.*) Each participant's account is charged with the amount of distribution taken and an allocation of administrative expenses. (*Id.*) The available investment options for participants in the Plan include various mutual funds, guaranteed investment contracts, and a self-directed brokerage account. (*Id.*) Plaintiff states that during the Class Period, which spans from July 6, 2014 through July 6, 2020 (*id.* ¶ 60), "Plan assets were held in trust by the Plan's custodians, Fidelity Management Trust Company and Prudential Retirement Insurance and Annuity Company," and that "[a]ll investments and asset allocations are performed through these trust instruments" (*id.* ¶ 22).

Among other investments, the Plan lineup offers a suite of thirteen "target date funds." (*Id.* ¶ 24.) A target date fund is an investment vehicle that offers an all-in-one retirement solution through a portfolio of underlying funds that gradually shifts to become more conservative as the assumed target retirement year approaches. (*Id.*) Managers make changes to the allocation to stocks, bonds, and cash over time, and these shifts are referred to as a fund's "glide path." (*Id.*) According to Plaintiff, as unsophisticated investors, "many of the Plan participants, by default, concentrate their retirement assets in target date funds," and that "by December 31, 2018, approximately 58% of the Plan's assets were invested in the Active suite." (*Id.* ¶ 28.) The

underlying mutual funds that target date fund managers choose to represent each asset class can be "actively" or "passively" managed. (Am. Compl. ¶ 24.) Funds are "actively" managed when the investment manager is responsible for deciding which securities should be bought and sold and in which quantities. (*Id.* ¶ 26.) On the other hand, "passively" managed funds, or "Index funds," invest according to an established and tracked market index. (*Id.*)

### B. *Claims Against Defendants*

Plaintiff alleges that Defendants' decision to add the Active suite funds as investment options in the Plan, as opposed to the Index suite funds, illustrates a breach of fiduciary duties. (Am. Compl. ¶ 26.) This is because the Active suite is "dramatically more expensive than the Index suite, and riskier in both its underlying holdings and its asset allocation strategy." (*Id.*) Additionally, Plaintiff asserts that "[a]ctively managed funds tend to charge higher fees than index funds," which "present an additional hurdle" to "provid[ing] value and compensat[ing] investors." (*Id.* ¶ 30.) Plaintiff alleges that "[t]he higher fee . . . represents an annual cost to investors that is over eight times higher than what shareholders of the corresponding Index fund pay" (*id.* ¶ 36) and that "[h]igher fees significantly reduce retirement account balances over time" (*id.* ¶ 37). Moreover, Plaintiff asserts that Morningstar[2] assigns a "purely mathematical measure" of performance for these funds, which "emphatically favors the Index suite." (*Id.* ¶ 39.)

In large part, Plaintiff challenges the inclusion of three specific funds in the menu of target date funds available to Plan participants: (1) the Fidelity Freedom Funds (*see id.* ¶¶ 24–41); (2) the John Hancock Disciplined Value Fund (*see id.* ¶¶ 43–46); and (3) the Baron Small Cap Fund (*see id.* ¶¶ 47–49) (collectively, "Challenged Funds"). Plaintiff claims that she and the other

---

[2] Morningstar is an "investment research firm that compiles and analyzes fund, stock, and general market data" that "issues risk ratings for publicly traded mutual funds and exchange-traded funds (ETFs)." *Morningstar Inc.*, INVESTOPEDIA, https://www.investopedia.com/terms/m/morningstarinc.asp (*last visited* Aug. 2, 2023).

participants of the Plan suffered losses as a result of Defendants' inclusion of the Challenged Funds as investment options in the Plan. Specifically, Plaintiff alleges that Defendants: "(1) failed to fully disclose the expenses and risk of the Plan's investment options to participants; and (2) selected, retained, and/or otherwise ratified high-cost and poorly-performing investments, instead of offering more prudent alternative investments when such prudent investments were readily available at the time that they were chosen for inclusion within the Plan and throughout the Class Period." (Am. Compl. ¶ 6.)[3]

The Amended Complaint lodges three claims against Defendants. First, Plaintiff asserts a "Breach of Fiduciary Duty" claim, pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502, 29 U.S.C. § 1132 (Count I), alleging that Defendants violated their fiduciary duties:

> "in that Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the Plan with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (c) by failing to act in accordance with the documents and instruments governing the Plan."

(*Id.* ¶ 74.) Second, Plaintiff asserts a claim for "Failure to Monitor Fiduciaries and Co-Fiduciary Breaches," pursuant to 29 U.S.C. §§ 1109(a) and 1105(a) (Count II), alleging that Medstar and the Administrative Committee breached their fiduciary monitoring duties by: "(a) Failing to monitor and evaluate the performance of their appointees or have a system in place for doing so"; "(b) Failing to monitor their appointees' fiduciary processes"; and (c) "Failing to remove appointees whose performances were inadequate." (*Id.* ¶ 83.) Third, in the alternative, and "to the extent that any of the Defendants are not deemed a fiduciary or co-fiduciary under ERISA," Plaintiff asserts

---

[3] Plaintiff's allegations as to each of the Challenged Funds are more fully detailed in the Court's Memorandum Opinion of February 4, 2021. (*See* ECF No. 34.)

a claim for "Liability for Knowing Breach of Trust" (Count III), alleging that "any such Defendants are liable for the conduct at issue" in this matter because "all Defendants possessed the requisite knowledge and information to avoid the fiduciary breaches at issue here and knowingly participated in breaches of fiduciary duty." (Am. Compl. ¶¶ 88, 89.)

## II.   *Procedural History*

On July 6, 2020, Plaintiff Reed brought this lawsuit on behalf of herself and the proposed class of all participants and beneficiaries in the Plan at any time on or after July 6, 2014 through the date of filing ("Class Period"). (*See* Compl. ¶ 55, ECF No. 1.) On August 4, 2020, Xania E. Watson also brought suit against Defendants, seeking relief for herself and the class of participants and beneficiaries in the Plan at any time between August 4, 2014 through the date of judgment. (*See* Case No. 20-2250-JKB, ECF No. 1, ¶ 44.) On September 21, 2020, the Court consolidated the two actions under the instant case: *Reed*, 20-1984-JKB. (ECF No. 10.) On September 22, 2020, Plaintiffs Reed and Watson filed the operative Amended Complaint. (ECF No. 11.)

On November 6, 2020, Defendants filed a Motion to Dismiss for Failure to a State Claim, asking this Court to dismiss all three counts of the Amended Complaint. (ECF No. 29.) By Memorandum Opinion and Order of February 4, 2021, the Court denied the Motion to Dismiss. (ECF Nos. 34, 35.) Thereafter, Defendants filed their Answer to the Amended Complaint. (ECF No. 43.)

On July 1, 2022, Plaintiffs filed a "Motion to Withdraw Xania E. Watson As A Named Plaintiff," pursuant to Federal Rule of Civil Procedure 21, which Defendants did not oppose. (ECF No. 62.) The Court granted the Motion to Withdraw on July 8, 2022, and Watson was removed as a plaintiff in this matter. (ECF No. 63.)

On August 5, 2022, Defendants filed two motions to exclude Plaintiff's proffered expert witnesses: "Motion to Exclude, In Part, the Opinions and Testimony of Dr. Gerald W. Buetow" (ECF No. 65); and "Motion to Exclude the Opinions and Testimony of Michael Geist" (ECF No. 66). On the same day, Plaintiff filed a similar motion concerning one of Defendants' experts: "Motion to Exclude Expert Opinions of Steven K. Gissiner." (ECF No. 69.)

Subsequently, on December 12, 2022, this action was reassigned to the undersigned. The Court held a telephonic scheduling conference with the parties on January 5, 2023, during which the parties informed the Court their private mediation was scheduled for March 20, 2023. (*See* ECF No. 81.) The parties agreed to have their then-pending motions denied without prejudice to their being re-filed if the effort to mediate proved unsuccessful. (*See id.*) Thereafter, on March 31, 2023, the parties informed the Court that their mediation attempt was unsuccessful, and the Court issued a Scheduling Order for briefing on the parties' anticipated motions. (ECF No. 86.)

On May 1, 2023, in accordance with the March 31, 2023 Scheduling Order, the parties filed the presently pending motions: (1) Defendants' Motion to Strike Plaintiff's Jury Demand (ECF No. 87); (2) Defendants' Motion to Exclude Buetow (ECF No. 88); (3) Defendants' Motion to Exclude Geist (ECF No. 89); and (4) Plaintiff's Motion to Amend the operative complaint (ECF No. 92).[4]

### III.  Analysis

Plaintiff's claims in this action—and the relief she seeks—are equitable in nature and therefore not within the purview of the Seventh Amendment's jury trial guarantee. On this basis,

---

[4] Plaintiff did not re-file her "Motion to Exclude Expert Opinions of Steven K. Gissiner" (ECF No. 69). In Plaintiff's Memorandum in Support of her Motion to Amend, Plaintiff explains that "although she continues to believe the portions of Mr. Gissiner's opinions challenged in the [previously filed] motion are unreliable, she has heeded to the Court's advice concerning pretrial expert exclusion motions and accordingly declines to renew her motion to exclude," but notes that she will test "the previously-challenged portions of Mr. Gissiner's opinions by way of cross-examination at trial." (Mot. Amend. Mem. Supp. at 2 n.3.)

the Court shall grant Defendants' Motion to Strike (ECF No. 87). In addition, the Court is satisfied

that Plaintiff's expert, Gerald Buetow, based his proffered opinions regarding Plan losses on a

reliable method, which he reliably applied to the facts at issue. Thus, the Court shall deny

Defendants' Motion to Exclude Buetow's testimony (ECF No. 88.) However, the Court does not

reach the same conclusion as to portions of the opinions proffered by Michael Geist, also Plaintiff's

expert. The Court shall exclude those portions of Geist's testimony concerning specific

calculations of losses, but will not exclude Geist's opinions as to the standard industry practice for

obtaining reasonable recordkeeping fees. Therefore, the Court shall grant in part and deny in part

Defendants' Motion to Exclude Geist's testimony (ECF No. 89.) The Court shall also grant

Plaintiff's Motion for Leave to File a Second Amended Complaint (ECF No. 92) to include

additional factual allegations obtained through discovery.

### A. *Motion to Strike Plaintiff's Jury Demand*

Plaintiff brings suit under ERISA's civil-enforcement section, § 502(a)(2) (Opp'n to Mot.

Strike at 7, ECF No. 98), which empowers participants or beneficiaries to seek redress for breach

of fiduciary duty by any plan fiduciary. *See* 29 U.S.C. § 1132(a)(2); 29 U.S.C. § 1109(a); *Perez*

*v. Silva*, 185 F. Supp. 3d 698, 701 (D. Md. 2016). The Amended Complaint notes that Plaintiff

demanded a jury trial. (*See generally* Am. Compl.) Defendants have moved to strike Plaintiff's

jury demand based on "the overwhelming weight of authority providing that participants bringing

suit under ERISA against retirement plan fiduciaries are not entitled to a jury trial." (Mot. Strike

Mem. Supp. at 5, ECF No. 87-1.)

Jury trials are available in some federal civil cases as a matter of congressional grace and

in others as a matter of constitutional guarantee. The Supreme Court of the United States has

expressly recognized that the Seventh Amendment's jury guarantee applies to "actions enforcing

statutory rights . . . if the statute creates legal rights and remedies, enforceable in an action for damages in the ordinary courts of law." *Curtis v. Loether*, 415 U.S. 189, 194 (1974). But, where, as with ERISA, a statute is silent as to the availability of a jury, *see Berry v. Ciba-Geigy Corp.*, 761 F.2d 1003, 1007 (4th Cir. 1985) (noting congressional "silence" on the availability of a jury in ERISA cases and opining that such silence returns the question to the common law of trusts, where "no jury trial obtains"), *abrogated in part on other grounds by Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), a party may nevertheless demand one if the action would vindicate inherently legal, as opposed to equitable, rights. *See* U.S. Const. amend. VII ("In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved."); *see also* Fed. R. Civ. P. 38(a) ("The right of trial by jury as declared by the Seventh Amendment . . . is preserved to the parties inviolate."); *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989) ("We have consistently interpreted the phrase 'Suits at common law' to refer to 'suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered.'" (citation omitted)).

"To determine whether a statutory action is more similar to cases that were tried in courts of law than to suits tried in courts of equity . . . the Court must examine . . . the nature of the action and . . . the remedy sought." *Tull v. United States*, 481 U.S. 412, 417 (1987). First, the Court must "compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity." *Id.* Then, the Court must "examine the remedy sought and determine whether it is legal or equitable in nature." *Id.* at 417–18. The second inquiry has more weight than the first. *Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 565 (1990).

9

This action is more comparable to cases tried in courts of equity. In general, "there is little doubt that actions brought under section 502(a)(2) are more akin to those actions traditionally adjudicated by the Chancellors at equity than to those adjudged in courts of law." *Perez v. Silva*, 185 F. Supp. 3d at 701–02. This is because "issues raised under [section 502(a)(2)] for breach of fiduciary duty are examined under trust law principles and fiduciary standards." *Broadnax Mills, Inc. v. Blue Cross & Blue Shield of Va.*, 876 F. Supp. 809, 816 (E.D. Va. 1995); *see also Varity Corp. v. Howe*, 516 U.S. 489, 496 (1996) (stating that ERISA's "fiduciary duties draw much of their content from the common law of trusts"); *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110 (1989) (observing that "ERISA abounds with the language and terminology of trust law" and that the Act's legislative history confirms that its fiduciary-responsibility provisions codify and make applicable to ERISA fiduciaries certain principles originating in the law of trusts). Thus, "Plaintiff['s] ERISA claim is analogous to that of a trustee's breach of fiduciary duty, which was traditionally decided by a court of equity." *Williams v. Centerra Grp., LLC*, 579 F. Supp. 3d 778, 782 (D.S.C. 2022). Plaintiff does not dispute that this action is inherently equitable in nature. (*See generally* Opp'n to Mot. Strike; *see* Reply Mem. Supp. of Mot. Strike at 5, ECF No. 103.)

Rather, Plaintiff argues that the second prong of this analysis—the characterization of the relief sought as legal or equitable—weighs in favor of a jury trial: "Despite ERISA's trust law roots, its remedial provisions provide for monetary relief do not automatically make such relief equitable in nature." (Opp'n to Mot. Strike at 10.) Plaintiff contends that the nature of the primary remedy sought in this action, compensatory damages, is "'the classic form of legal relief,'" and therefore entitles her to a jury trial guarantee under the Seventh Amendment. (*Id.* at 7 (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993)).) Further, Plaintiff contends that because she seeks sums of money to be paid from Defendants' general assets, rather than "'particular funds

or property in the defendant's possession,'" the relief sought cannot be deemed equitable. (Opp'n to Mot. Strike at 7 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 214 (2002)).)

Plaintiff leans heavily on a trilogy of Supreme Court cases to support her arguments in favor of a right to a jury trial: *Mertens*, 508 U.S. 248; *Great-West*, 534 U.S. 204; and *Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Benefit Plan*, 577 U.S. 136 (2016). However, as the district court recognized in *Williams*, each of these cases "involve[ed] ERISA claims against non-fiduciaries," distinguishing them from the case *sub judice*. *Williams*, 579 F. Supp. 3d at 784. Moreover, this trilogy of cases "fail[s] to address the ultimate issue of whether there is a Seventh Amendment right to a jury trial under ERISA." *Id.* Accordingly, the dicta referred to by Plaintiff in this Supreme Court trilogy is inapplicable to the instant case.

Plaintiff's reliance on *Cunningham v. Cornell Univ.*, Civ. No. 16-6525, 2018 WL 4279466 (S.D.N.Y. Sept. 6, 2018), is also misplaced. The district court in *Williams* expressly rejected a similar argument relying on *Cunningham*. The *Williams* Court explained:

> In *Cunningham*, the court departed from the majority approach that claims under § 1132(a)(2) are equitable in nature because it was constrained by its circuit's interpretation of *Great-West* in a non-ERISA case, *Pereira v. Farace*, 413 F.3d 330, 340 (2d Cir. 2005). The *Cunningham* court even noted that the Second Circuit in *Pereira* "may have over-read *Great-West* in applying its dictum to the issue of the right to trial by jury under the Seventh Amendment." 2018 WL 4279466, at *4. But unlike the court in *Cunningham*, this court is not bound to follow *Pereira* . . . . And this court, like others who have addressed the issue, rejects *Cunningham* in light of the Supreme Court's decision in *Amara* and the great weight of authority holding that claims for monetary relief under § 1132(a)(2) are equitable in nature.

*Williams*, 579 F. Supp. 3d at 785. The *Williams* Court ultimately concluded that the sought-after monetary relief—of the same character sought by Plaintiff in this action—was equitable in nature, and that "the weight of authority consistently striking jury demands in cases like this one" rendered it proper to strike the jury demand. *Id.* In sum, the *Williams* Court "agree[d] with Defendants,

that *Amara* supports a finding that the monetary relief sought here is equitable in nature, and *Mertens*, *Great-West*, and *Montanile* are inapplicable." *Id.*

This Court similarly found that an ERISA plaintiff was not entitled to a jury trial in *Perez*, 185 F. Supp. 3d 698, which also relied on the authority from the Supreme Court's decision in *CIGNA Corp. v. Amara*, 563 U.S. 421 (2011). *See Perez*, 185 F. Supp. 3d at 703–04. In *Amara*, the Supreme Court concluded that courts of equity "possessed the power to provide relief in the form of monetary 'compensation' for a loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment," and that "prior to the merger of law and equity this kind of monetary remedy against the trustee, sometimes called a surcharge, was exclusively equitable." *Amara*, 563 U.S. at 441–42 (internal quotation marks and citations omitted). Guided in part by *Amara*, this Court concluded in *Perez* that the monetary remedy sought against a fiduciary was "comparable to a *surcharge*, a trust remedy that is 'equitable in character and enforceable . . . in a court exercising equity powers.'" *Id.* at 703 (emphasis in original) (quoting Restatement (Third) of Trusts § 95 (Am. Law Inst. 2012)). Indeed, the Restatement (Third) of Trusts specifies that "[i]f a breach of trust causes a loss . . . the beneficiaries are entitled to restitution and may have the trustee surcharged for the amount necessary to compensate fully for the consequences of the breach." *Id.* cmt. b.

Plaintiff attempts to distinguish this action from *Perez*, arguing that *Perez* is inapplicable because it involved the Secretary of Labor suing for breaches of fiduciary duty, rather than participants or beneficiaries as here. (*See* Opp'n to Mot. Strike at 12–13.) Plaintiff contends that the fact that the Secretary sought "no compensation for himself, for his Department, or for the Government" was the basis for the *Perez* Court's characterization of the sought-after monetary damages as a "surcharge." (*See* Opp'n to Mot. Strike at 12 (quoting *Perez*, 185 F. Supp. 3d at

704).) Therefore, Plaintiff argues, the monetary relief sought in this case cannot fairly be compared to a surcharge because "Plaintiff is a participant in the Plan whose account would receive an allocation of any damages recovered on behalf of the Plan." (Opp'n to Mot. Strike at 12–13.)

However, Plaintiff mischaracterizes the Court's conclusion in *Perez*. This Court specifically noted in *Perez* that it characterized the relief sought as a "surcharge" because, "should the Court grant [the Secretary's] prayer, Defendants will be required to restore all losses to the Plans and thereafter distribute all Plan assets to the participants and beneficiaries." *Perez*, 185 F. Supp. 3d at 704. Consequently, the relief sought in the present matter is, in fact, substantially similar to that sought in *Perez*.[5]

In accordance with *Perez*, *Williams*, and *Amara*, the undersigned concludes that: (1) the claims in this action are inherently equitable in nature; and (2) the relief sought by Plaintiff is equitable in nature. Accordingly, Plaintiff is not entitled to a jury trial in this case.

But, Plaintiff asks that the Court extend this inquiry: "Even if the Court determines there is no Constitutional right to a jury trial on Plaintiff's legal claims, Plaintiff requests that the Court empanel an advisory jury," pursuant to Fed. R. Civ. P. 39(c)(1). (Opp'n to Mot. Strike at 15.) Plaintiff lodges two arguments in support of this request: (1) "[a]n advisory jury is desirable" because "[t]he perspective of community members on the fiduciary conduct of retirement plan sponsors is particularly desirable given that defined contribution plans, such as the Plan, have largely become America's retirement system and fiduciary standards impact all retirees"; and (2) "[g]ranting a jury trial also ensures the matter proceeds efficiently" because "[i]f this case were tried in a bench trial and the Court of Appeals later found a jury trial right, a second trial would be

---

[5] Plaintiff also argues that a second "dispositive distinction" exists because in *Perez*, this Court noted that "the relief requested is mainly injunctive in nature," *id.*, whereas the present case predominantly seeks monetary relief. (*See* Opp'n to Mot. Strike at 12–13.) But, as discussed above, the monetary relief sought by plaintiff is itself equitable in nature, deriving from the law of trusts. Accordingly, this fact does not distinguish the instant case from *Perez*.

needed." (Opp'n to Mot. Strike at 15–16.) Defendants oppose this request. (*See* Reply Mem. Supp. of Mot. Strike at 12–13.)

Both of these arguments were expressly addressed and rejected by the district court in *Williams*, which provides useful guidance. As to the first argument regarding community perspectives, the district court explained that it was unpersuaded because "[t]he court's role is to apply the law to Plaintiffs' ERISA claims" and "[i]ncorporating the community's perspective into this legal matter is unwarranted." *Williams*, 579 F. Supp. 3d at 786 (first citing *Beesley v. Int'l Paper Co.*, No. 06-703, 2009 WL 260782, at \*6 (S.D. Ill. Feb. 4, 2009) ("While Plaintiff argues that an advisory jury would incorporate the public's views of morality, it is the job of the Court to decide the legal viability of Plaintiffs' claims and the Court has an extensive and comprehensive statutory and regulatory framework established under ERISA in which to rely."); then citing *Johnson v. Georgia-Pacific Corp.*, 19 F.3d 1184, 1190 (7th Cir. 1994) ("[B]ecause ERISA is a highly technical statute our part is to apply it as precisely as we can, rather than to make adjustments according to a sense of equities in a particular case.")). As to the second argument regarding efficiency in light of a potential appeal and overturn of standing precedent, the *Williams* Court aptly explained:

> If the court's judgment is reversed, the case will be remanded for a new jury trial even if "an advisory jury was impaneled and the court accepted the advisory verdict, or a party wishes to accept the verdict of the advisory jury." 8 Moore's Federal Practice–Civil § 39.40[3] (2021). Rather than promoting judicial economy, it appears an advisory jury would only prolong proceedings and increase trial cost.

*Williams*, 185 F. Supp. 3d at 785–76. The same is true here. Therefore, the Court declines to empanel an advisory jury in this case.

Accordingly, the Court shall grant Defendants' Motion to Strike (ECF No. 87).

**B.  *Motions to Exclude Expert Testimony***

Federal Rule of Evidence 702 allows a witness "who is qualified as an expert by knowledge, skill, experience, training, or education" to "testify in the form of an opinion or otherwise" if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

A district court's role is to ensure "that an expert's testimony both rests on reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).  "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."  *Id.* at 592–93.  This basic gatekeeping obligation applies to all expert testimony, not just scientific testimony.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

To be reliable, an "expert opinion must be based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods."  *Oglesby v. General Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999).  A district court enjoys wide latitude in determining what indicia of reliability are most relevant in a given case.  *See Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017).  Those indicia may include:

> (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether a technique has a high known or potential rate of error and whether there are standards controlling its application; and (4) whether the theory or technique enjoys general acceptance within the relevant community.

*Fireman's Fund Ins. Co. v. Tecumseh Prods. Co.*, 767 F. Supp. 2d 549, 553 (D. Md. 2011) (quoting *Kumho Tire*, 526 U.S. at 149–50). However, the Supreme Court in *Kumho Tire Co.* concluded that "a trial court *may* consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability," but "as the Court stated in *Daubert*, the test of reliability is 'flexible,' and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." Thus, although the four factors may be useful in analyzing the admissibility of expert testimony, they are not required nor are they dispositive.

The party offering the testimony "bears the burden of establishing its admissibility by a preponderance of the evidence." *Brodsky v. KaVo Dental Techs.*, No. 15-3587-PX, 2017 WL 6388611, at *4 (D. Md. Dec. 14, 2017).

### 1. Gerald Buetow

Defendants have moved to exclude the testimony of Plaintiff's expert, Dr. Gerald W. Buetow, pursuant to Fed. R. Evid. 702. (*See generally* Mot. Excl. Buetow Mem. Supp., ECF No. 88-1.) The opinions expressed in Buetow's expert reports concern the calculation of losses suffered by the Plan as a result of Defendants' inclusion of the Challenged Funds. (*See id.* at 4.)

Buetow explains in his February 11, 2022 Expert Report ("Buetow's Report") that "[i]n order to carry out the loss calculations performed" in this case, he "evaluate[d] suitable replacement funds." (Buetow Report ¶ 31, Mot. Excl. Buetow Ex. 1, ECF No. 88-3.) Buetow's Report described his methodology as follows:

> [F]or each challenged fund, an alternative was identified using a robust performance analysis as of the nearest month-end to the beginning of the Class Period (June 2014). I considered all funds in the same Morningstar category, *e.g.*, Target Date YYYY as potential replacement funds.[1] I ranked those potential replacement funds based on a composite score of standard metrics . . . that are used throughout the industry and that I have used throughout my career.
>
> The performance composite score utilized in this analysis measures characteristics that a fiduciary would use to identify appropriate and suitable replacement funds

for actively managed funds that may not meet fiduciary standards.[1]   Once the scores are tabulated, the fiduciary would rank or sort them (*i.e.*, from high to low) to identify those funds that are suitable replacements.   For the purposes of this analysis, this process created a subset of funds that a fiduciary would consider appropriate and suitable.

. . . As such, I generate a composite score for each target date provider across a spectrum of target dates and select that provider with the best performance.

. . .

To identify suitable alternative funds over the Class Period using this best-in-class methodology, I first compute composite scores using cumulative return over the Class Period.   These are then equally weighted with the performance composite to create the subset of possible suitable replacement funds within the asset category.

. . .

I first compute the interim cash flows using the balance data provided.

. . . I then use the beginning balance as of June 30, 2014 and the subsequent interim cash flows[1] to compute the corresponding terminal wealth that participants would have realized had they invested in the applicable replacement fund ("Replacement Fund").   In essence, I "replace" each [Challenged Fund] with the Replacement Fund: I assume the Replacement Fund had the same balances and cash flows that were associated with the [Challenged Fund].   This allows one to calculate the balances participants would have experienced if they had been provided the opportunity to invest in the Replacement Fund instead of the [Challenged Fund].   The damages are then the difference between this alternative terminal wealth and the wealth that was realized by participants who invested in the [Challenged Fund.]

(Buetow Report ¶¶ 31–33, 39, 42, 43.)  Defendants argue that Buetow's method is neither reliable nor reliably applied.  (*See generally* Mot. Excl. Buetow Mem. Supp.)

Defendants argue that Buetow's "fund replacement methodology" is not reliable because it "suffers from lawyer-driven hindsight bias."  (*Id.* at 8.)  Defendants take issue with the fact Buetow incorporated into his analysis a legal principle provided by Plaintiff's counsel.  (*See* Mot.

Excl. Buetow Mem. Supp. at 8–11.)[6] In Buetow's Report, he stated: "I understand from Plaintiff's counsel that courts often accept loss calculation models that assume replacement of imprudent investments with the most favorable of suitable alternatives." (Buetow Report at 14–15.)[7] Defendants contend that this renders his method unreliable, characterizing it as "hindsight-based methodology dictated by Plaintiff's counsel." (Mot. Excl. Buetow Mem. Supp. at 10.)

Although Defendants contend that the assumption regarding replacement with the most favorable alternatives is unfounded (id. at 7–8), the Court need not make a specific determination as to whether the legal principle underlying Buetow's analysis applies here. At this juncture, the Court is neither determining which methodology to apply in determining losses, nor it is actually awarding damages. Rather, the Court is tasked with determining whether to exclude Buetow's testimony based on the reliability of his methodology and application of that methodology.

To that end, Defendants argue that Buetow's analysis is not reliable because it is "plagued with hindsight bias." (Mot. Excl. Buetow Mem. Supp. at 4.) They argue that there is hindsight bias because the analysis "incorporates cumulative returns during the Class Period that were *unknowable*" at the start of the Class Period. (*Id.* at 6 (emphasis in original).) In other words, Defendants argue that because they could not have known how well an alternative fund would have performed in the stock market without "the benefit of hindsight," Buetow's method cannot

---

[6] Defendants also challenge Buetow's opinion as unreliable because it is not peer reviewed nor is it "generally accepted." (Mot. Excl. Buetow Mem. Supp. at 11–12.) However, the Court is not limited to these factors in determining reliability. *See Kumho Tire Co.*, 526 U.S. at 149–50 (noting that courts may, but are not required, to consider the *Daubert* factors and acknowledging that the factors may be, but are not necessarily, relevant for expert opinions grounded in technical expertise or experience-based expertise, rather than scientific expertise). Moreover, Buetow's Report states that this method is commonly used in the industry, with citations to various publications, and Defendants have not presented any evidence to the contrary.

[7] Plaintiff does not dispute that Buetow performed his analysis with this legal assumption in mind. Rather, Plaintiff argues that this "assumption is well-supported by law," (Opp'n to Mot. Excl. Buetow at 14, ECF No. 100.), relying primarily on *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985). In *Donovan*, the Second Circuit determined that "[w]here several alternative investment strategies were equally plausible, the court should presume that the funds would have been used in the most profitable of these." *Id.* Plaintiff also notes that the Fourth Circuit has followed the principles set forth by "*Donovan's* trust-law-based formula." *Peters v. Aetna*, 2 F.4th 199, 222–23 (4th Cir. 2021).

reliably calculate losses suffered as a result of Defendants' choice of funds at that time. (Mot. Excl. Buetow Mem. Supp. at 6.)

"The Court professes to no expertise in the area of" retirement plan securities investment strategy. *Davidson v. Cook*, 567 F. Supp. 225, 240 (E.D. Va. 1983), *aff'd sub nom. Davidson for & on Behalf of Loc. 666 Ben. Tr. Fund v. Cook*, 734 F.2d 10 (4th Cir. 1984), *and aff'd sub nom. Accardi v. McGuire, Woods & Battle*, 734 F.2d 10 (4th Cir. 1984). At this juncture, "[t]he Court has no means of evaluating," *id.*, whether Buetow's fund replacement methodology is the best or most accurate means of assessing the actual losses or damages in a breach of fiduciary duty case. However, "proponents [of expert testimony] 'do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable . . . . The evidentiary requirement of reliability is lower than the merits standard of correctness.'" Advisory Committee Note to the 2000 amendment to Rule 702 (quoting *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 744 (3d Cir. 1994)). The record before the Court does not indicate that Buetow's methodology is "inherently unreliable." *Id.* Thus, Plaintiff has met her burden to demonstrate that Buetow's expert testimony is reliable. *See Brodsky*, 2017 WL 6388611, at *4.

Defendants' various challenges to Buetow's damages calculation methodology are more properly resolved on cross-examination. As the Second Circuit has explained:

> Although expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are "so unrealistic and contradictory as to suggest bad faith" or to be in essence an "apples and oranges comparison," other contentions that the assumptions are unfounded "go to the weight, not the admissibility, of the testimony." A district court has discretion under Federal Rule of Evidence 703 "to determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony."

*Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996); *see Verona v. U.S. Bancorp*, Civ. No. 7:09 -057-BR, 2011 WL 1252935, at *18 (E.D.N.C. Mar. 29, 2011) (same).

19

The Fourth Circuit has affirmed this principle. In *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 195 (4th Cir. 2017), the Court concluded that "'questions regarding the factual underpinnings of the [expert witness'] opinion affect the weight and credibility' of the witness' assessment, 'not its admissibility.'" *Id.* (quoting *Structural Polymer Grp. v. Zoltek Corp.*, 543 F.3d 987, 997 (8th Cir. 2008)); *see also Mr. Dee's Inc. v. Inmar, Inc.*, No. 1:19CV141, 2021 WL 4224720, at *17 (M.D.N.C. Sept. 16, 2021) ("[A]s a general rule, 'arguments regarding the comparability or appropriateness of a particular benchmark go to the weight, not the admissibility, of a benchmarking analysis.'" (quoting *AngioDynamics, Inc. v. C.R. Bard, Inc.*, 537 F. Supp. 3d 273, 341–42 (N.D.N.Y. 2021)). In other words, "the rejection of expert testimony is the exception rather than the rule." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Production Liab. Litig. (No. II)*, 892 F.3d 624, 631 (4th Cir. 2018)

Moreover, when the Supreme Court in *Daubert* designated district courts as gatekeepers of expert testimony, it did not intend to "supplant the adversary system or the role of the jury." *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1311–12 (11th Cir. 1999). Rather, the Supreme Court explained that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *see also In re Lipitor*, 892 F.3d at 631 (stating that the district court "is not intended to serve as a replacement for the adversary system" (citation and quotation marks omitted)); *United States v. Moreland*, 437 F. 3d 424, 431 (4th Cir. 2006) (noting that "expert testimony is subject to testing by vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof"). Thus, to the extent that Defendants wish to raise concerns with Buetow's methodology, they should do so on cross-examination. Defendants' challenges as to the reliability of Buetow's methodology are not

sufficient to justify exclusion. *See Jones v. Coca-Cola Consol., Inc.*, No. 320CV00654FDWDSC, 2022 WL 441606, at *1 (W.D.N.C. Jan. 18, 2022) (denying a motion to exclude Buetow's testimony and noting that "[a]t this stage . . . the Court is not convinced Dr. Beutow [sic] is an improper experiential expert whose methodology, and the application thereof, are unreliable.").

Defendants next assert that Buetow did not reliably apply his methodology. They argue that despite the fact that Buetow identifies the first step in his analysis as "collect[ing] a list of all funds in the same Morningstar category as each challenged fund," the three replacement funds identified for the John Hancock Disciplined Value Fund "were in different Morningstar categories than [that fund] for at least a portion of the Class Period." (Mot. Excl. Buetow Mem. Supp. at 13.) In sum, although the first step in Buetow's methodology is to identify funds within the same Morningstar category as the John Hancock Disciplined Value Fund, three of the replacement funds he used in the analysis were in different Morningstar categories from the John Hancock Disciplined Value Fund at various times during the Class Period. In other words, each of the three replacement funds migrated between categories during the Class Period, such that each was in the same Morningstar category as the John Hancock Disciplined Value Fund for some of the time, and in a different category at other times.

However, Plaintiff contends that the fact that "the alternative funds were not within the same Morningstar category for the entirety of the Class Period is of no moment" because the category to which each such fund migrated "contradicted the category for which the investment managers designated and designed the fund," and "the fluidity of those funds' category designation" is only a "minor discrepancy" that "should not affect a prudent fiduciary's analysis of reviewing potential alternative replacement funds." (Opp'n to Mot. Excl. Buetow at 19–20.)

Defendants do not dispute Plaintiff's explanations for the deviation, nor do they dispute its impact on the analysis. Instead, Defendants staunchly adhere to their contention that the methodology was not strictly followed to the letter, arguing only that Buetow's "arbitrary departure from his already unreliable methodology renders his opinions meaningless." (Reply Mem. Supp. of Mot. Excl. Buetow at 13, ECF No. 104.) To support their argument that this deviation from Buetow's stated methodology renders the method "unreliably applied," Defendants cite only to *Silicon Knights, Inc. v. Epic Games, Inc.*, Civ. No. 5:07- 275-D, 2011 WL 6748518, at *7 (E.D.N.C. Dec. 22, 2011). In that case, the district court excluded the testimony of a proffered expert because the expert made "arbitrary modifications" to his method. *Id.* But here, Buetow explained the deviation in his deposition testimony. He testified that this was not inconsistent with his overall methodology because the migration of funds through categories is "the nature of . . . the categories themselves" and that Morningstar is not "infallible." (Buetow Dep. 162:07–164:16, ECF No. 100-2 at 31–33.) Buetow explained that the Morningstar data was not yet available for these three replacement funds, so he selected each of these replacement funds based on a qualitative metric—the funds' prospectus, which provides detail regarding an investment offering—and "assumed that the prospectus accurately represented the asset class where the fund resided." (Buetow Dep. 164:22–165:05, ECF No. 88-5 at 23–24.) Thus, Buetow used the prospectus, rather than the then-unavailable Morningstar category, to identify replacement funds for the John Hancock Disciplined Value Fund. Buetow further stated that Morningstar attempts to "objectify" its classifications "with certain fundamental criteria," but that "sometimes those criteria fall right on the border" of two categories, and this "flip-flopping back and forth" is "not uncommon." (*Id.* at 164:10–15.) He also opined that a prudent fiduciary would make the same asset classification. (*Id.* 165:16–166:04.) Although Defendants make much noise about this

modification, they do not challenge any portion of Buetow's explanation, nor do they explain how this minor deviation renders the method unreliably applied.

It is true that Rule 702(d) "does not permit the expert to make claims that are unsupported by the expert's basis and methodology." Fed. R. Evid. 702(d). But, it does not require the Court "to nitpick an expert's opinion in order to reach a perfect expression of what the basis and methodology can support." Advisory Committee Note to the 2023 amendment to Rule 702. Buetow explained how the inclusion of this fund is supported by his methodology. Therefore, this issue again goes to the weight of the testimony, not its admissibility, and is best challenged on cross-examination.

Accordingly, the Court shall deny Defendants' Motion to Strike Buetow (ECF No. 88).

### 2. *Michael Geist*

Defendants seek to exclude the testimony of a second expert proffered by Plaintiff, Michael Geist. (*See generally* Mot. Excl. Geist.) Plaintiff proffers Geist "to testify on the reasonable market rate for the [recordkeeping and administrative ('RK&A')] services obtained by the Plan and the Plan's losses as a result of its payment of excessive fees." (Opp'n to Mot. Excl. Geist at 12, ECF No. 99.) Geist's Expert Report of February 11, 2022 ("Geist's Report") provides opinions as to the process of obtaining a reasonable recordkeeping fee and the actual dollar amount Defendants could and should have negotiated for, as well as the losses he calculated based on this figure. (*See generally* Geist Report, Mot. Excl. Geist Ex. 1, ECF No. 90-1.)

### a. *Geist's Loss Calculations*

Defendants argue that Geist's calculation is arbitrary and based only on his "say-so," which they argue is not reliable under the standards set forth by Rule 702 or *Daubert*. (Mot. Excl. Geist Mem. Supp. at 4, ECF No. 90.)[8]

As to this calculation of losses, Geist opines: "Fidelity, or any other recordkeeper managing more than 70% of the Plan's assets, would have been willing to provide a proprietary discount of more than $4 per participant to maintain the Plan as a client." (Geist Report ¶ 45.) Based on the bid the Plan received in 2020 for a $33 per participant recordkeeping fee, Geist concludes that the "reasonable fair market price" for the Plan's recordkeeping services would have been "no greater than $28 per participant" throughout the six-year Class Period. (*Id.* ¶ 48.) Geist's Report also asserts that "bids received by the Plan Fiduciaries in 2020 are materially similar to the bids the Plan Fiduciaries would have received just prior to and throughout the Class Period." (Geist Report ¶ 31.)

Geist cites to no data, scholarly publication, or other source for these assertions. Instead, Geist explains that this assessment is based on his "experience." (*Id.* ¶¶ 42, 45, 46, 49, 50.) Thus, the Court is not able to review the basis for this opinion, nor is the Court able to conclude that Geist used any objective source of pricing information from a third party to form this opinion. Consequently, the inescapable conclusion is that Geist's specific calculation of losses amounts to no more than conjecture or speculation. As one district court has explained: "[E]xperience is not a methodology. Methodology is the process by which the expert relates his experience to the facts at hand in order to reach an expert opinion." *Dean v. Thermwood Corp.*, Civ. No. 10-0433-CVE-PJC, 2012 WL 90442, at *7 (N.D. Okla. Jan. 11, 2012).

---

[8] Defendants filed under seal the Memorandum in Support of the Motion to Exclude Geist. (ECF No. 90.) Defendants also filed a redacted copy for the public docket. (ECF No. 89-2.)

Geist did not explain a process by which he obtained the specific calculation as to the Plan losses. Rather, he speculated as to the outcome of negotiations that did not occur. (*See* Geist Report ¶ 45 ("Based on my experience, . . . Fidelity, or any other recordkeeper . . . would have been willing to provide a proprietary discount of more than $4 per participant to maintain the Plan as a client.").) However, speculative or conjectural testimony is not permissible under the standards set forth for expert testimony in *Daubert* and Rule 702. *See, e.g.*, *Troudt v. Oracle Corp.*, 369 F. Supp. 3d 1134, 1139 (D. Colo. 2019) ("[Geist's] opinion in this regard falters because the relevant methodology by which he reached his conclusions remains undisclosed, making it impossible to conclude whether this opinion is reliable."); *Pledger v. Reliance Tr. Co.*, Civ. No. 1:15-4444-MHC, 2019 WL 4439606, at *18 (N.D. Ga. Feb. 25, 2019) (concluding that Geist's testimony was inadmissible as based on conjecture because "Geist purports to calculate a precise reasonable fee using his 'knowledge of the marketplace'" and "failed to use any objective source of pricing information to determine the baseline prices"); *Seawell v. Brown*, 2010 WL 11561287, at *9 (S.D. Ohio Sept. 9, 2010) (excluding an expert's opinion as unreliable because the "finding that the Plan suffered $11 million in losses is based on pure speculation . . . . [the expert] testified that he performed no statistical analysis . . . . it appears that [the expert] simply created his own method of calculating damages for the purposes of this litigation. He has pointed to nothing in the literature or elsewhere to show that his method is an accepted method."); *Butler v. First Acceptance Ins. Co.*, 652 F. Supp. 2d 1264, 1272 (N.D. Ga. 2009) ("An expert's opinion testimony becomes inadmissible, however, where it is connected to existing data only by the *ipse dixit* of the expert." (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).[9]

---

[9] Plaintiff cites *Garthwait v. Eversource Energy Co.*, No. 3:20-CV-00902 (JCH), 2022 WL 3019633 (D. Conn. July 29, 2022), where the district court admitted Geist's expert testimony, arguing that Geist's proposed testimony in the case *sub judice* is similar to that in *Garthwait* and should therefore also be deemed admissible. In *Garthwait*, the district court concluded that Geist's testimony was reliable because "Geist reached his opinions that the Plan paid

### b. Geist's Opinions on Standard Industry Practice

Geist's opinions regarding standard industry practice do not evoke the same concerns. Indeed, "some types of expert testimony are more suited to existing frameworks of scientific rigor than others," as certain expert opinions "may be more reliant on the experience of the expert and 'softer' criteria." *Payne Inc. v. Bore Express, Inc.*, Civ. No. 1:21-00048-JMC, 2022 WL 2315738, at \*1 (D. Md. June 28, 2022). This makes the "district court's task in examining the reliability" of such expert testimony "somewhat more opaque." *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007). Where a district court is faced with such "experiential expert testimony," it must require the "experiential witness to explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts." *Id.* (internal quotation marks and citation omitted) (alterations in original).

In this case, Geist's experience appears sufficient to support his opinions on standard industry practice. Geist presently acts as a "retirement plan consultant," which entails "soliciting bids from recordkeepers . . . on behalf of plan fiduciaries" and "perform[ing] research on retirement plans and retirement plan fees." (Geist Report ¶ 7.) Prior to this, Geist "spent over ten years in the Retirement Plan Services division of T. Rowe Price" where he "was responsible for delivering, creating, and/or governing over 20,000 pricing proposals for over 10,000 retirement plans." (Geist Report ¶ 10.) Moreover, he has been "directly involved with pricing proposals for retirement plan services, including recordkeeping and administrative services" in various roles since 2005. (*Id.*) Geist's most recent role at T. Rowe Price involved "development and management of

---

excessive fees by calculating the fees for ten 'comparable' plans" and "surveyed data from 5500 forms for the ten plans" to calculate the fees. *Id.* at \*15. However, in the instant case, Geist testified that he did not rely on such data: "Did I use any specific data point of any one of those 5500 forms in formulating my opinion in this case? No, because when I look at the data and the information in this case, it's consistent with that I already understand about the market anyway. So I didn't go and do a bunch of other analysis related to 5500 forms or anything like that." (Geist Dep. 186:07–14, ECF No. 89-6 at 6.) Accordingly, Geist's testimony in this case is not comparable to his testimony in *Garthwait.*

recordkeeping fee services and solutions" for the company.  In addition, Geist testified that he was "pricing for T. Rowe Price during" the Class Period, during which time he "built the pricing model and the bidding mode."  (Geist Dep. 176:18–177:08, ECF No. 99-2 at 5–6.)  Defendants do not challenge Geist's qualifications.

At this juncture, the Court is tasked with deciding whether Geist has "sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case."  *Kumho Tire Co.*, 526 U.S. at 156.  Considered together, Geist's decades-long career in retirement plan management, in addition to his personal experience soliciting and crafting recordkeeping fee bids, are sufficient to qualify him to opine on the general processes by which recordkeeping costs are ascertained, and the negotiation generally employed by a prudent fiduciary to lower those costs.   These opinions appear to be reasonably derived from his experience and shall not be excluded from his testimony at trial.

Accordingly, the Court shall grant in part and deny in part Defendants' Motion to Exclude Geist (ECF No. 89), as described in this Memorandum Opinion.[10]

### C.  Motion for Leave to File A Second Amended Complaint

Plaintiff moves for leave to file a Second Amended Complaint to include "additional detailed factual allegations concerning Defendants' flawed process for monitoring the Plan's RK&A fees and ensuring those fees were reasonable for the services obtained, which directly resulted in participants paying grossly excessive fees."  (Mot. Amend. Mem. Supp. at 10, ECF No. 93.)  Plaintiff alerted the Court of her intention to file the instant Motion to Amend during the

---

[10] Defendants also seek to exclude Geist's testimony on the ground that it is irrelevant to the claims in this matter. (*See* Mot. Excl. Geist Mem. Supp. at 9–10.)  Defendants refer to their arguments against Plaintiff's Motion to Amend, specifically that the Amended Complaint does not allege a breach of fiduciary duty as to the Plan's recordkeeping fees. (*See id.*)  Because the Court rejects this argument below, and concludes that Plaintiff shall be permitted to amend the operative complaint to include further detail as to these allegations, the Court easily concludes that Geist's proposed testimony is relevant to this matter. *See Belville v. Ford Motor Co.*, 919 F.3d 224, 232 (4th Cir. 2019) ("To be relevant, or helpful, expert testimony must have a valid connection to the pertinent inquiry.").

March 31, 2023 status conference. (*See* ECF No. 86.)  Aside from the Court's March 31, 2023 Scheduling Order for briefings on the parties' various motions, the operative Scheduling Order for deadlines in this litigation provided that the deadline for amendment of pleadings took place on April 6, 2021. (ECF No. 58.)  Thus, the instant Motion to Amend comes two years after the deadline for amendment. However, the Court concludes that the Motion to Amend satisfies the requirements of Fed. R. Civ. P. 15 and 16 for the reasons set forth below.

A motion for leave to amend pleadings filed beyond the deadline set forth in the scheduling order will only be granted if it satisfies both the "good cause" standard of Federal Rule of Civil Procedure 16(b)(4) and the standard of Rule 15(a)(2) for allowing amendment of pleadings. *See Moses v. Cowan Distrib. Servs., Inc.*, Civ. No. JKB-10-1809, 2012 WL 527657, at *2 (D. Md. Feb. 16, 2012).

Good cause exists if "deadlines cannot reasonably be met despite the party's diligence." *Cook v. Howard*, 484 F. App'x 805, 815 (4th Cir. 2012) (per curiam) (quotations omitted).  Courts consider "whether the moving party acted in good faith, the length of the delay and its effects, and whether the delay will prejudice the non-moving party." *Elat v. Ngoubene*, 993 F. Supp. 2d 497, 520 (D. Md. 2014) (citing *Tawwaab v. Va. Linen Serv., Inc.*, 729 F. Supp. 2d 757, 768–69 (D. Md. 2010)).  Modification should not be permitted where the movant "has not acted diligently" to comply with the schedule. *Cook*, 484 F. App'x at 815 (quotations omitted).

If the Court is satisfied that good cause exists, it applies the Rule 15(a) standard, which directs the Court to "freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).  The Fourth Circuit has stated that leave to amend under Rule 15(a) should be denied only in three situations:  (1) when the opposing party would be prejudiced; (2) when the amendment is sought in bad faith; or (3) when the proposed amendment would be futile. *Laber v. Harvey*, 438 F.3d 404,

426 (4th Cir. 2006).  An amendment is not prejudicial if the defendant "was from the outset made

fully aware of the events giving rise to the action." *Davis v. Piper Aircraft Corp.*, 615 F.2d 606,

613 (4th Cir. 1980).  In such situation "an allowance of the amendment could not in any way

prejudice the preparation of defendant's case." *Id.*

    As noted, Plaintiff seeks to amend the operative complaint (ECF No. 11) to include factual

allegations as to Defendants' process for monitoring RK&A fees and the excessive fees incurred

as a result of Defendants' fiduciary breaches. (*See* Mot. Amend. Mem. Supp. at 10.)  Plaintiff

asserts that these facts were "unavailable to Plaintiff prior to discovery" and characterizes the

proposed additions as mere factual allegations to support the already existing, and unchanged,

claims asserted in this action.  (*Id.* at 6.)

    Defendants oppose the Motion to Amend in large part based on their assertion that the

Proposed Second Amended Complaint "adds a new claim—never before asserted—alleging that

Defendants" breached their fiduciary duties with respect to "excessive recordkeeping and

administrative fees." (Opp'n to Mot. Amend. at 4, ECF No. 96.)  In sum, Defendants argue that

"the Operative Complaint does not contain a single allegation about excessive recordkeeping fees

paid by the Plan," and therefore that the inclusion of these new allegations would prejudice

Defendants because "the proof required to defend against [this set of factual allegations] is

fundamentally different" than for the initial set of allegations. (*Id.* at 5.)  And, Defendants argue

that the Motion to Amend cannot satisfy Rule 16's requirement for "good cause" because the

deadline to amend pleadings was too long ago for this Motion to be considered "diligent." (*See*

*generally* ECF No. 58; Mot. Amend.)

    As to Rule 16, Defendants do not contest that the new allegations were unavailable to

Plaintiff prior to discovery.  Instead, Defendants focus on their contention Plaintiff cannot meet

the requirement for "diligence" because Plaintiff waited months after the close of discovery, and years after the deadline to amend, to file the instant motion.  (Opp'n to Mot. Amend. at 14–16.)[11] Plaintiff explains in her reply brief that the Motion to Amend was filed at this late stage because it was not until the parties' attempted mediation—on March 20, 2023—that she learned that Defendants contested the scope of the operative complaint to include allegations of breach based on the allegedly excessive RK&A fees.  (Reply Mem. Supp. of Mot. Amend. at 13, ECF No. 102 ("[T]he length of time between the close of discovery and the instant Motion is irrelevant given that all parties understood the scope of the claims in this action to include Plaintiff's RK&A allegations until Defendants . . . challenged the existence of RK&A claims at the March 20, 2023 mediation.  The parties raised this issue the very next week at their March 31, 2023 status conference with the Court.").)  The Court is satisfied that Plaintiff did not demonstrate a lack of diligence in light of these events.  Accordingly, the Court concludes that Plaintiff has demonstrated good cause under Rule 16.

Having concluded that Plaintiff satisfies the good cause standard of Rule 16(b), the Court easily concludes that she also satisfies the requirements of Rule 15(a).  The Court is unpersuaded by Defendants' arguments concerning prejudice.

---

[11] Defendants also assert that "the Court should disregard arguments related to the Rule 16(b) 'good cause' standard which are raised for the first time in Plaintiff's reply brief, if any" because they argue that "Plaintiff does not attempt to explain her failure to meet" the deadline for amendment of pleadings in her Memorandum in Support of the Motion to Amend.  (Opp'n to Mot. Amend. at 14.)  Although Defendants are correct that Plaintiff did not expressly reference Rule 16 or its good cause requirement, Plaintiff does provide explanation under this standard, specifically asserting that she "had no way of knowing, much less asserting, these additional RK&A allegations before engaging in discovery." (Mot. Amend. Mem. Supp. at 13.)  Thus, the Court is satisfied that Plaintiff did assert arguments to satisfy the good cause requirement, even in the absence of express reference to Rule 16.  Even if this were not the case, "the power to decline consideration of such arguments is discretionary, and the courts are not precluded from considering such issues in appropriate circumstances." *Clawson v. FedEx Ground Package Sys., Inc.*, 451 F. Supp. 2d 731, 734 (D. Md. 2006).  Plaintiff's reply brief identifies the correct legal standard governing her Motion and contains arguments relevant to that standard.  Thus, to the extent that these are arguments raised for the first time, the Court considers the arguments raised in Plaintiff's reply brief for purposes of resolving the pending Motion.

Defendants argue that the claim for breach of fiduciary duty never included allegations regarding the RK&A fees so they were not on notice that it would serve as a factual basis supporting Plaintiff's claims. (*See* Opp'n to Mot. Amend. at 17–19.) Contrary to Defendants' assertion that "the Operative Complaint does not include a single allegation about excessive recordkeeping fees" (*id.* at 18), Plaintiff plainly asserted in Count I that "Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interests of the Plan's participants and beneficiaries and (a) for the exclusive purpose of . . . (ii) defraying reasonable expenses of administering the plan." (Am. Compl. ¶ 72.) In the "Class Allegations" section of the Amended Complaint, Plaintiff asserted that "[t]here are numerous questions of fact and/or law that are common" to the Class, including "whether Defendants breached their fiduciary duties under ERISA by failing to defray the reasonable expenses of administering the Plan." (*Id.* ¶ 61.) And, in Plaintiff's response in opposition to Defendants' motion to dismiss, Plaintiff stated:

> Indeed, Plaintiffs' allegations show that fiduciaries of most comparable plans were able to secure investment, recordkeeping, and other administrative services for far less than Defendants. The reasonable inference is that the Plan's fees are excessive, not that comparable plans are paying significantly less for deficient services.

(ECF No. 34 at 32.)[12]

Although Defendants provide line-by-line interpretations of several allegations contained in the Amended Complaint (*see* Opp'n to Mot. Amend at 8–9), they fail to provide any explanation as to why references to "expenses" and "fees" in the Amended Complaint do not encompass fees for recordkeeping services. If, as Defendants assert, such claims are "wholly different" from claims "for imprudent investment management," then it is unclear why Defendants did not

---

[12] The Court is conscious that the sufficiency of Plaintiff's allegations is limited to the face of the operative complaint and cannot be amended by way of motions, briefs, or statements in discovery. *See Zachair, Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (stating the plaintiff "is bound by the allegations contained in [his] complaint and cannot, through the use of motion briefs, amend the complaint."). However, the Court references these documents to support the conclusion that Defendants were aware that Plaintiff made allegations as to recordkeeping fees in the Amended Complaint.

specifically challenge the sufficiency of these allegations at an earlier stage in this litigation.[13] And, despite this characterization that the claims are "wholly different," Defendants state that there is "substantial overlap in the individuals who were responsible for monitoring the Plan's investment options and recordkeeping services," so it was natural that discovery on the investment management claims yielded "information about the Plan's recordkeeping fees during discovery." (Opp'n to Mot. Amend at 19.)  Defendants do not clarify how, or in what way, such allegations yield entirely distinct claims, while simultaneously yielding substantially overlapping discovery.

In addition, Plaintiff's responses to Defendants' interrogatories further demonstrate that Defendants were on notice of Plaintiff's allegations regarding excessive recordkeeping fees. (*See* Plaintiff Elsa Reed's Responses and Objections to Defendants' First Set of Interrogatories, Opp'n to Mot. Amend. Ex. 13, ECF No. 96-14.)  Defendants requested that Plaintiff "[s]tate whether [she] contend[s] that any Defendant breached its fiduciary duty of loyalty to the Plan, and, if so, State the Basis for that contention."  (*Id.* at 9.)  Plaintiff responded, in pertinent part, that Defendants breached their fiduciary duties by "enabling Fidelity to collect excessive fees for services provided to the Plan" and that Defendants "acquiesce[d] to the Plan's service providers, including Fidelity, without measures to ensure participants' interests were appropriately considered and prioritized."  (*Id.* at 9–10.)[14]  Therefore, it appears clear that Defendants have long been on notice that Plaintiff intended to pursue claims based on allegations of excessive recordkeeping fees.

---

[13] The Court acknowledges that Defendants previously filed a Motion to Dismiss the Amended Complaint.  However, it does not appear that the Motion specifically addressed allegations as to excessive fees.

[14] The Amended Complaint notes that Fidelity was the Plan's recordkeeper during the Class Period.  (*See* Am. Compl. ¶ 37 ("Fidelity is heavily incentivized to promote its own investment products . . . to each plan for which it recordkeeps, including the Plan.").)

Defendants argue that they incur prejudice because they did not seek the proof needed for these claims during the discovery period. (Opp'n to Mot. Amend. at 18.) In particular, Defendants argue that they will suffer prejudice because "Defendants did not retain an affirmative expert to opine on the reasonableness of the Plan's recordkeeping fees," but merely "engaged a rebuttal expert." (Opp'n to Mot. Amend. at 21.) However, Defendants provide no insight into how this operates to prejudice them. Indeed, Defendants do not offer the Court any distinction between the testimony they would elicit from an "affirmative expert" versus a "rebuttal expert," nor do they request any opportunity to seek an affirmative expert—or engage in any additional discovery, for that matter—should the Court grant Plaintiff's Motion to Amend. In other words, Defendants did not provide any explanation or description of the discovery of which they feel they have been deprived.

Defendants rely on *Deasy v. Hill*, 833 F.2d 38 (4th Cir. 1987), to support their argument as to prejudice arising from the inability to obtain an affirmative expert. But, the circumstances at play in *Deasy* were vastly different than here. In *Deasy*, the Fourth Circuit found that the defendant was prejudiced by an amendment to the complaint because "hinting at a claim in an expert witness statement leaves the opposing party guessing at one's real intentions." *Id.* at 41. The Court concluded that the defendant was prejudiced because although she "may have deposed plaintiff's experts on the issue," she "did not may any affirmative effort to disprove" the claim by, "for example, hir[ing] her own experts to testify that her performance . . . was not negligent." *Id.* In contrast, in this case, Defendants were not left to rely on a statement by an expert witness, but by allegations asserted in the Amended Complaint. And, Defendants did make an "affirmative effort to disprove" Plaintiff's claims as to excessive recordkeeping fees by hiring their own rebuttal expert. Defendants misconstrue *Deasy* as describing a distinction between affirmative and rebuttal

33

experts. It makes no such distinction. Rather, *Deasy* refers to the distinction between affirmative efforts to combat a plaintiff's claims as opposed to "minimal precautionary measures." *Id.* Unlike *Deasy*, Defendants in this case took affirmative efforts to counter Plaintiff's claims as to recordkeeping fees, most notably by hiring a rebuttal expert. Thus, *Deasy* is not applicable to the case *sub judice.*

Because Defendants were "made fully aware of the events giving rise to the action," the Court finds that "an allowance of the amendment could not in any way prejudice the preparation of [Defendants'] case." *Davis*, 615 F.2d at 613. No party has requested that discovery be re-opened. Nonetheless, the Court notes that it shall not re-open discovery at this juncture.

Accordingly, the Court shall grant Plaintiff's Motion to Amend (ECF No. 92).

## IV. *Conclusion*

For the reasons stated above, a separate Order shall issue granting Defendants' Motion to Strike (ECF No. 87), denying Defendants' Motion to Exclude Buetow (ECF No. 88), granting in part and denying in part Defendants' Motion to Exclude Geist (ECF No. 89), and granting Plaintiff's Motion to Amend (ECF No. 92).

DATED this _9_ day of August, 2023.

BY THE COURT:

James K. Bredar
Chief Judge

34